13-23-17 Thomas M. Cooley Law School Kurzon Strauss LLP et al. David Asinska Oral Argument 15 minutes for the plaintiff, 15 minutes to be shared by the defendants. Mr. Coakley for the plaintiff appellate. Thank you. Your Honor, I'd like to reserve three minutes for rebuttal. You may. Please proceed. May it please the Court, I'm Mike Coakley, appearing on behalf of Thomas M. Cooley Law School. With me this morning are Jim Thalen, who is the general counsel of Thomas Cooley, and at the council table, my partner Paul Hudson. Your Honor, there are five main reasons why a summary judgment in this case should be reversed. The first is that in ruling on the summary judgment motions, the district court did not believe Cooley's evidence, and did not draw all reasonable inferences from the evidence, from the entire record, in Cooley's favor, but instead, to review the opinion, it's apparent that the court drew inferences in favor of the defendants. The second reason that the summary judgment should be reversed is that the district court incorrectly applied the New York Times standard of actual malice to the defamation in this case, because Cooley is a private figure. The third reason that the summary judgment should be reversed is that the New York Times actual malice standard does not apply here, because the defamation statements were false commercial speech, not entitled to any constitutional protection, let alone the heightened protection of the New York Times rule. Fourth reason that- Mr. Cooley, you can structure this any way you want, but we've read the pleadings. Wouldn't it behoove us to get right to the question of whether Cooley is a limited purpose public figure, and then go on to actual malice? Well, Your Honor, it would, except that the evidence that Cooley submitted, which the district court did not appear to credit, goes to the issue of public figure and goes to the actual malice standard. And if we review that evidence and review it in light of the facts most favorable to Cooley, it demonstrates that these defamatory statements were published with actual malice. There's clear and convincing evidence that the statements were not substantially true. We submitted evidence of the employment reports themselves, which this court, in the McDonald case, found that, as a matter of law, were not fraudulent. And one of the main defamatory statements in the J.D. Underground Post and in the draft complaint was supposedly that Cooley was a fraudulent enterprise and that its employment data was fraudulent. The other statement was that there was a Department of Education investigation and Cooley submitted evidence, clear evidence, that there was no Department of Education investigation and that the source of that supposed Department of Education investigation, the All Education Matters blog post, that blog host characterized that report as a possible hoax and because of that... Mr. Cooley, if I could interrupt you again, I gather we're now moving on, we're going right to the actual malice before we figure out what the standard is. So that's okay. If you want to do that, we'll do that. You're focusing in on whether these statements were ultimately true or false. And I would submit to you that, at least it seems to me from reading all of these cases, that in virtually every case of defamation there is something that's false. That's why there's the lawsuit that's brought. When New York Times says, assuming that it applies, you have to find actual malice, we're really looking to the knowledge of the person who made the statement because of the importance of First Amendment rights and why are we going to chill the press by virtue of these type of defamation suits. So I don't think anybody really disputes that there may have been some things that turned out to be false or close to being false. So could we focus in on what the test is, which is the subjective test going to the state of mind of the declarant, not whether they're right or wrong. Well, Your Honor, it's true. Well, the actual malice test, as I understand it, is to show that there were false statements. So that's the first part. And the second part is to show that either the statements were made with knowledge that they were false or that they were made with reckless disregard of whether or not they were true. That's correct. And the reason that I wanted to review the sequence of events with the source of the information and what Mr. Anziskin knew about it is because the evidence that Cooley submitted on summary judgment showed a reckless disregard of the truth. There are five ways to show reckless disregard. Purposeful avoidance of the truth, deliberate decision not to acquire knowledge of probable falsity, a high degree of awareness of probable falsity, extreme departure of professional standards in the investigation, and five obvious reasons to doubt the veracity of the informant or the accuracy of his reports. So on the first grounds for showing reckless disregard, purposeful avoidance of the truth, here we have evidence that the claim that there was a Department of Education investigation was a possible hoax. That's what the blog host, the source of Mr. Anziskin's claim, said. This is a possible hoax that I reported yesterday. And I'm going to drop this story until someone contacts the Department of Education and determines whether or not there's an investigation. Mr. Anziskin testified that he saw that subsequent post, but did he contact the Department of Education before he published the statement that Cooley was under investigation? No, he didn't. The same applies with the claim that Cooley's graduates were defaulting at the rate of 41% on their student loans. There's no report in the record of a 41% default rate. Did Mr. Anziskin contact any authoritative sources to determine what the true rate of default was for Cooley's students, which was 2.2%? No, he didn't. That was information that was readily available to Mr. Anziskin on a Department of Education website. Deliberate decision not to acquire facts that might confirm or the probable falsity of the statements. Here again, Department of Education investigation. He's been warned. He has red flags showing that this claim is a possible hoax, and yet he does nothing to verify it. He goes ahead and publishes anyway. The same applies for the default rates and the claim that Cooley was underreporting the default rates for its graduates. If he had gone to the Department of Education, he would have learned that Cooley doesn't report default rates. That's a job that the Department of Education does. What about a high awareness of probable falsity? There we submitted evidence that Mr. Thelen wrote a letter to the blog host saying that the Department of Education claim of a Department of Education investigation was false. That letter was posted by the blog host at a time when Mr. Anziskin was avidly watching the All Education Matters blog to learn information about Cooley, and yet he claims that he never saw Mr. Thelen's letter. More importantly on a high degree of awareness of probable falsity is Mr. Anziskin's own admission to Mr. Thelen that he did not know whether or not the statements that he published were true. And inexplicably to us, there is no mention of Mr. Anziskin's admission in the lower court's opinion. And also on a high degree of awareness of probable falsity, we have the retraction. So Mr. Thelen calls... Let me interrupt and ask you this question about the Anziskin statement about he did not know because that appears in your briefs and now it appears again in your oral argument today. As I read the material, when he says that in his deposition, you got to put it in the context of what he's being asked about. He's being asked about his personal knowledge of any DOE investigation. That statement doesn't refer to the statements in the draft proposed class action complaint as I understand it correctly. So am I reading the record right or wrong? With respect to the Department of Education investigation, yes, that is not repeated in the draft complaint. When he says that... When you quote Anziskin's statement that he didn't know, what are you attributing didn't know to? Didn't know what? What are you using that for? I'm using that for an inference that he did not know whether or not the statements, all of the statements in his J.D. Underground post were true because that was... All of the statements? All of the statements. If I go back and look at that, I'm not going to find that he's only talking about knowledge of the DOE investigation. Well, you know, and certainly Mr. Anziskin will take that position, but... I go back and read the deposition that you're referring to. Is it going to be limited to his knowledge of the DOE investigation? Mr. Anziskin's deposition, I don't know, but what I'm talking about is... That's where his statement appears, right, in his deposition. No, the statement appears, Your Honor, in Mr. Thalen's contemporaneous notes that he made while he was talking to Mr. Anziskin on the phone about the J.D. Underground post. Okay, I got it. I'll look at that again. Thank you. And so... Your time is up. Thank you, Your Honor. Mr. Coakley, before you go. For the first time in the case, you argue on appeal that your client did not have to establish actual malice because this was commercial speech. You concede that you did not raise this issue in the district court. Also, did you or did you not raise the issue of commercial speech in your complaint? Did you plead it? We did not, Your Honor. You did not? Okay, why should we concern ourselves with issues that are not pled? Well, Your Honor, this goes to the New York Times standard, which is a claim that we made below, and this is a legal argument in support of the claim. But it's factual, isn't it? Pardon? Isn't it a factual matter? You're saying that, as a matter of fact, this is commercial speech, but you just told me you didn't plead. Well, we didn't plead the legal theory. You didn't plead the fact either, did you? Well, yes, we did, because what we're saying is that commercial speech is the J.D. Underground Post itself. That it's a solicitation. I don't see that in your complaint anywhere. I mean, I look for it. I said, okay, maybe somehow the law firm failed to raise this very important issue in the district court, and we should review it for plain error. And I'm thinking, well, is it even before us in the lawsuit? And I looked at it and I said, no, it's not even in the lawsuit. We did, Your Honor, plead that the J.D. Underground Post and the draft complaint were solicitations, and that they were solicitations by means of misrepresentation. So we didn't call it commercial speech, but we did say it was a solicitation. And, in fact, Mr. Strauss has taken over. This isn't a proper matter that we give the litigant the benefit of the doubt or anything. Okay, thank you. Thank you, Your Honor. I just want to make clear. I'm going to be having ten minutes. It says five minutes over here. And my colleague, Mr. Strauss, will have ten minutes. It pleases the court. You're not making it clear at all. Oh. You say you have ten minutes when I don't know who you are. Sorry, David Nziska. All right, so you want ten minutes. Ten minutes. And Mr. Strauss is going to have five minutes. Thank you. This case has always been about one thing, to punish myself and my colleague, Mr. Strauss, for having the temerity to represent 12 Cooley graduates who sued the school for inflating its postgraduate employment data. And it's never been about the merits of the case. It's always just been a sham slap lawsuit. Indeed, appellant's dean, Donald Duke, was frank enough to admit this when he stated in an interview with the National Law Journal in August 2011 that the motivation for filing the lawsuit was simply that Curzon Strauss, LLP, was planning to file a lawsuit. If it had not gone out as a draft complaint, we probably would have handled it in a somewhat different way. Now, just to look at the merits of their claims. First, the statements regarding Cooley's inflating its postgraduate employment data. As Judge Yonker correctly noted, the core allegations of this case, namely that Cooley had committed fraud in the way it inflated its postgraduate employment data, are either substantially true or non-actionable, hyperbole, and appellant does not come remotely close to demonstrating that the statements were posted with malice or, for that matter, the even more negligent standard. And I submit, just look at their 2010 employment report. In its 2010 employment report, Cooley asserted that the average salary for all graduates, let me emphasize all graduates, was a seemingly impressive $55,000. However, in 2012, appellant finally released revised data showing that only 17% disclosed any type of... We're only about 40 feet away from you. Sorry. This is not a jury. That only 17% disclosed any type of salary information, rendering appellant's purported figures 100% false, 100% inaccurate. And as far as we can tell... Let me stop you right there. Yeah. Did they do anything in 2010 in the manner in which they reported that was inconsistent with the way all law schools were reporting because that's the way they were asked to report? Yes. They made an overt... They expressed an overt falsehood. Most law schools, when they would say disclose salary information, they would say reported mean salary X amount and then failed to disclose that only a small sliver of graduates reported salary information. Here, Cooley made the overt misrepresentation that this figure was for all graduates. All. Even if you're right on the salary information, there's also these allegations that there are reports that the students are defaulting on loans with an astounding 41% and the school is currently being investigated by the DOE. I mean, you've got these other allegations. So even if you're all right on salary, how do you... So I... Are the other ones, in your opinion, factually correct? They're not factually correct, but you can see that they're not. Yes. Just in terms of the other statements. So I think we all now can see that their core allegations about inflating their employment data is wrong. And let's move on to the other statements. In the other statements, we're just talking about one... Essentially, Peli's case comes down to a single sentence in a post on an obscure website, primarily read by disgruntled attorneys, which was only posted for six days. That's what they came... No, published. Okay, I understand. So let's go through them then. As Judge Yonker, the content of the statements, the sentences, there are reports that these students are defaulting on loans on an astounding 41% and that the school is currently being investigated by the DOE for failing to adequately disclose its students true to false weights. Judge Yonker, he ruled in our favor on two grounds. First, he correctly noted that the statement is qualified. It says there are reports of certain loan default rates in a DOE investigation. It does not directly assert the truth of the default rates in the investigation. Secondly, Cooley failed to demonstrate... He noted that Cooley failed to demonstrate malice, considering that my statements were based on two detailed reports by anonymous whistleblowers that were posted on the education website, All Education Matters. Now, Cooley makes big hay of the fact that Ms. Johanson, the author of the website, All Education Matters,  but as I note in my appellate brief and as the... As I note in my appellate brief, when they specifically... She only labeled it a hoax in so much as the fact that he was anonymous. And when they pressed me whether she was labeling it a hoax, you just read the report. If you just read the subsequent report, it is 100% clear that she wasn't somehow disputing the veracity of it. She's just saying he's a whistleblower. I don't know 100% sure whether he is accurate. He's an anonymous whistleblower. Also, so that's for that point. The other point about Jim Thelen's largely self-serving letter, I was never given the opportunity to establish on the record that I only first saw Mr. Thelen's letter to All Education Matters after I posted on JD Underground, and it was only after when Mr. Thelen contacted me five days later. And the reason why I was never able to establish this fact is because they never asked me about this document in the seven hours of deposition, and in their 75-page consolidated motion opposing summary judgment, they didn't raise this point once. So I was never given the opportunity. Now, in terms of their commercial speech argument, we filed a sur-applied brief directly addressing this issue and the question of whether they waived it. And I would just like the court to look at Kentucky School Board Insurance Trust, in which the Sixth Circuit in a 1999 case written by Judge Ryan, he expressly rejected the exact same argument that Cooley raises and pointedly distinguishes the Supreme Court case of Yee v. City of Escondido, the case that Cooley primarily relies on, on the ground that it dealt with the prudential limitations applicable to the Supreme Court's certiorari jurisdiction, as opposed to the question of whether a party can address an issue it failed to raise before a lower court. So the Sixth Circuit expressly rejects Cooley's argument that they have not waived this contention, they have not waived this issue, because it raised, it had previously briefed the overall issue of whether Cooley is hiding First Amendment protection. And my last point is that there's a third reason why the court should deny their claims on that single sentence in J.D. Underground, and that's the issue of damages. And Cooley cannot identify a single prospective student who viewed, much less relied on, the J.D. Underground post. Indeed, comments... Isn't there a supposed expert report someplace that says... Yes, so let me get to that. Mind if I finish my question before you yell back at me? All right. Thank you. Isn't there a supposed expert report someplace where that claims that they've been damaged to the tune of some $17 million? Yes. Now, in the face of that, you don't have a corresponding expert report on the other side? No, but we move... So why on earth would we get into that today? We moved on Daubert motions, and the court... Can't the court look at our Daubert... We preserved it as an argument. We moved on it in Daubert motions, and I kind of feel if you just look at their expert reports, it's a total... It's just shockingly amateurish. What does that have to do with whether Cooley was a general purpose or... No, I understand. I was giving a third reason. What does that have to do with actual malice? Okay, I understand. That's, I guess, about it I have. All right. Thank you. Well, did you raise the Daubert issue in your brief? Yeah, I raised it. I will. I believe on page 55 I expressly said that they can't prove damages from the... That's the single sentence. And then on the sir reply brief, and I assume you guys all have the sir reply brief on footnotes, and also I mentioned the Daubert brief as well on the... Probably not such a good idea to refer to courts of appeals as you guys. Sorry. Particularly when you look at the composition of this panel. Sorry. I just slipped. I'm really sorry. Thank you. Your time is up. That's why seveners say you all. Anything else? Rick, did you have anything? No, no. All right. Thank you. Good morning. May it please the court. My name is Jesse Strauss. I represent myself and my former firm, which was known as Berzon Strauss, which is also a defendant in this matter and now an appellee. Judge Yonker's opinion, and this should be affirmed, the appellants in this matter in Mr. Coakley's presentation didn't mention my name once. I was a partner with Mr. Curzon. Mr. Anziska was of counsel to our firm. Mr. Anziska came to the firm indicating that he wanted to be involved in class action work. He presented a couple different options about things he wanted to work on. One of them was suing law schools. The next time I heard about what Mr. Anziska was up to was when I received a letter from Mr. Coakley accusing my firm of defamation. I tried to mediate this dispute as best I could, as I think I've continued to do throughout this appeal. One of the things that has troubled me throughout this entire proceeding is that I'm a member of the Western District of Michigan. I'm a member of this court. I'm a member of federal district courts around the country. I'm a member of the New York State Bar. I take my obligations there incredibly seriously. I have told Cooley time and again of my role in this. I have built a comprehensive record in the court below, a great personal and professional cost to me because I have my own practice, indicating that I never published a single statement about Cooley to any third party until such time as I filed a complaint against them on behalf of my clients. Cooley has time and again basically said that I'm a liar about this, and this is incredibly troubling to me. And it's very troubling that they can come into this court and make similar allegations despite time and again presenting evidence that I had no role in the defamation. I can read you sites from the record that we've developed. In response to this, in their brief, Cooley has weaved supposition that Mr. Ansicca, and you just heard from him, was somehow my patsy. Well, the draft class action lawsuit was circulated on behalf of your law firm, was it not? That is an assumption that Cooley has made. It certainly had my law firm's name on it. Was that unauthorized? Our position has been it was. Our position was that they had no authority to do class action lawsuits, that you denied them the authority? At the time that Mr. Ansicca was circulating the class action complaint, he had no clients for it. He was looking at prospective. That wasn't part of the duties that he had with the law firm? The agreement that we had, and it's in the record, I don't have the site here. The agreement that we had with Mr. Ansicca was once he has clients, he is to come to us, and we will say if it's a lawsuit we want to work on. Mr. Ansicca took that to mean that he can circulate a draft complaint, and I think that he only circulated the draft complaint to people who had first expressed interest to him. This wasn't a general solicitation. It was marked attorney-client privilege. I've reviewed very carefully what Mr. Ansicca did in this case, what he did with respect to that draft complaint, because obviously that's an issue with respect to whether or not there would be cross-claims or indemnity here. What he had done there is he basically took it upon himself to present a sample to these potential clients, and they weren't clients at the time. I have malpractice insurance for my firm. He did it with apparent authority of the law firm, correct? I do not believe that under New York State law, which I think would be the applicable law in this case, there was apparent authority there. One has apparent authority under New York State law when— Aren't these all fact questions that nobody's really ever gotten to? Well, we've briefed it time and again, and if you review it— Yeah, sure. Are you asking us to make these fact determinations? I am not asking you to make these fact determinations. I understand why you're indignant about this whole thing, but what's the point? The point of raising this is that I feel as if I've been unjustly accused by Cooley of having some association with this case. I have told them time and again and built a very comprehensive record of my role. Judge Yonker did not address my role in this matter. The important issue here, of course, is the malice issue. We are assuming that Cooley is a public figure. I'd be happy to speak on that, although I think Mr. Anziska spoke on that. It would be impossible for them to indicate any actual malice because I had no idea what was going on here. It would also be impossible, by the way, for them to indicate negligence. I am not sure that they can ascribe Mr. Anziska's lack of due care or Mr. Anziska's supposed alleged actual malice to me having no idea that this was happening. As I thought about how I would try this case as to myself and my law firm, it would be very difficult for me to make a presentation to the jury to explain to them that my state of mind cannot be at issue here because there's nothing in the record about it. They won't be able to say anything now. If I may just make one concluding point. Just finish your thought. Sure. The fact here is that I conducted no investigation until such time as I was alerted to what Mr. Anziska had been doing, and by that time everything had already been out there, and I had no actual malice here because I have no animosity towards Cooley other than the fact that they're suing me now, and therefore I can't imagine how this suit could proceed against me. Thank you, Your Honors. These are all potential issues, but they're really not ripe at this point because they haven't been addressed, and if we were to reverse and remand, it seems like that would be the time that you would maybe get a ruling on these things. Your Honor, to drag myself, my firm, and my family through this in the Western District of Michigan just to demonstrate to a jury in the Western District of Michigan that I had no part in this I think would be a grave injustice. Thank you. Thank you, Your Honor. Cooley's had only one purpose in pursuing this defamation case, and that is to pursue its basic right to protect its good name. The U.S. Supreme Court has recognized that basic right is on a par with the First Amendment rights that the defendants are asserting here. It's not a slap suit. It never has been a slap suit. Do they deny that statement was made? No, they don't, but it's taken out of context, Your Honor, and you have to remember that the defamatory statements in this case were made months before Mr. LaDuke made those comments, and the defendants were saying all along, look, we're going to sue. This is what the whole thing is about, to gin up interest in a class action complaint. So Mr. LaDuke was explaining why he took action when he did to protect Cooley's good name. That was the purpose and the only purpose of this lawsuit. With respect to Mr. Strauss' involvement, the district court did find that there was ample evidence of his involvement in defamatory conduct. Mr. Strauss undertook, rested the response to our cease and desist letter from Mr. Anziska. He not only had control over Mr. Anziska, he exercised that control, and in his retraction statement that he posted, he acknowledged that the investigation was on behalf of the firm, and he retracted the defamatory statements on behalf of the firm. So I don't know what Mr. Strauss was thinking about when he said that Judge Yonker had not addressed this, but on his motion for sanctions, one of many in this case, Judge Yonker denied the motion for sanctions and said there's ample evidence from which a jury could find. Where does it say in the statement that Strauss posted on J.D. Underground that the statements have been made on behalf of the firm? The retraction says that as part of the firm's investigation. Maybe I only have a part of it. I'm sorry, and maybe I'm referring to his letter. I might have those mixed up, Your Honor. I think you do. In his letter back to me, it was on behalf of the firm in which they agreed to post a retraction. And in the J.D. Underground post itself, it says this firm is conducting an investigation. There's nothing in what I have before me that says they're conducting an investigation. I'm sorry, Your Honor, but the post itself does, the retraction itself does say it has been brought to this firm's attention that a post on this website entitled Investigating Thomas Cooley Law Firm. It just doesn't say what you say. It says that's all. You're right, Your Honor. It does not. All right. Thank you. Not the precise words. All right. Thank you, Your Honor. Thank you, Mr. Coakley. The case will be submitted.